1 **ROGER J. PEVEN**
  WSBA #6251
2 Law Office of Roger J. Peven
  1408 W. Broadway Ave.
3 Spokane, WA 99201
  Telephone: 509-323-9000
4 Email: rjpeven@gmail.com

**JUSTIN P. LONERGAN**
WSBA #55216
Bohrnsen Stocker Smith, PLLC
312 W. Sprague Ave.
Spokane, WA 99201
Telephone: 509-327-2500
Email: jlonergan@bsslslawfirm.com
**(CJA Mentee)**

5

Attorneys for Defendant – Gordon Lee McVay

6

7 **UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**

8

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| 9 ) | **CASE NO. 2:21-CR-0054-WFN** |
|        **Plaintiff,** ) | **CASE NO. 2:21-CR-0055-WFN** |
| 10 ) | |
|   vs. ) | |
| 11 ) | **AMENDED MOTION TO** |
| **GORDON LEE McVAY,** ) | **SUPPRESS** |
| 12 ) | *Evidentiary Hearing Set for* |
|        **Defendant.** ) | *January 12, 2022 at 9:00 a.m.* |
| 13 ) | |
| _____ ) | |

14

15 <u>**Summary and Motion**</u>

16      *"The Fourth Amendment does not allow the Government to label a person*

17 *as a drug dealer and then view all of their actions through that lens."*

18 <u>United States v. Drakeford</u>, 992 F.3d 255, 264 (4th Cir. 2021).

19      Yet, that is precisely what occurred when Wenatchee Police Department

20

**AMENDED MOTION TO SUPPRESS - 1**

1  (WPD) and affiliated agencies rushed to judgment against Mr. McVay and

2  executed a series of ill-informed and untenable searches and seizures based on the

3  mere impression that he was dealings drugs from his property.

4      As such, Defendant Gordon McVay, by and through the undersigned

5  counsel, moves the Court for an order suppressing various evidence as fruits of

6  multiple violations of the Fourth Amendment to the United States Constitution.

7  The evidence resulted from both warranted and warrantless searches and seizures.

8  Mr. McVay submits this as an amended motion applicable to both of his pending

9  indictments, as the facts overlap and the legal significance of WPD's actions

10  cannot be neatly segregated.   The evidence to be suppressed includes:

11      1.  All evidence resulting from the search of a residence at 704 South

12  Western Avenue, Wenatchee, Washington on or about October 30, 2020, including

13  but not limited to:

14          a.   A .22 caliber Ruger pistol, serial no. 14-45862;

15          b.   A box of mail labeled "Gordy's Mail," and all contents; and

16          c.   All documents, physical items, or other property intended to be

17  introduced by the Government at trial.

18      2.  All evidence derived from the seizure and search of a motorcycle driven

19  by Mr. McVay on or about October 30, 2020, including the search of a "fanny

20

1 pack" in which WPD discovered alleged drugs and paraphernalia.

2 <h1 style="text-align:center">I. FACTS</h1>

3 <h2 style="text-align:center">A. General Background</h2>

4     This case involves two search warrants issued by judges of the Chelan

5 County Superior Court. The first warrant issued on October 23, 2020 by Judge

6 Roy Fore, and the second warrant issued on October 30, 2020 by Judge Kristin

7 Ferrera. See Exhibit A, Search Warrant, dated October 23, 2020 ("the first

8 warrant") and Exhibit B, Search Warrant, dated October 30, 2020 ("the second

9 warrant"). WPD Officers Sund and Gonzalez were the affiants, respectively.

10 See Exhibit C, Declaration for Search Warrant, dated October 23, 2020 ("the first

11 warrant declaration"), and Exhibit D, Declaration for Search Warrant, dated

12 October 30, 2020 ("the second warrant declaration").

13 <h2 style="text-align:center">B. WPD's Initial Investigation</h2>

14     On October 22, 2020, Officers Gonzalez and Sund arranged for an

15 undisclosed CI to make a controlled drug buy from a local drug dealer with a

16 lengthy criminal history, hereinafter referred to as "Source." See Exhibit E,

17 Search Warrant and Declaration for Search Warrant ("Source Warrant"), dated

18 October 22, 2020, pg 4. The officers arranged for the undisclosed CI to purchase

19 $80.00 of methamphetamine from the dealer. Id., pg 5. Officers observed the

20

1   buy between the CI and the dealer, and later recovered the drugs from the CI's

2   person.   Id., pgs 5-6.   Other WPD officers arrested the dealer on a pretext traffic

3   stop, after which Officers Sund and Gonzalez began interrogating her.   Id., pg 6.[1]

4         The dealer immediately lied about selling drugs to the CI, telling the officers

5   that she met with the CI "to pickup some money owed to her."   Id.   The dealer

6   elaborated on her false story, stating "it was $80 and the debt was for some money

7   she lent to the CI to fix his car a few weeks ago."   Id.   Officer Gonzalez

8   unequivocally reported that "[she] denied delivering any drugs."   Id.

9         WPD called out the dealer on her lies.   Id.   Officers Gonzalez and Sund

10  told her that "the entire transaction between herself and the CI was observed by

11  surveillance units and explained to her we had already recovered the drugs from

12  the CI."   Id.   Only then did she "*finally* admit[] to selling the CI [an] eight ball[.]"

13  Id. (emphasis added).

14        Later that day, Officer Gonzalez swore out a search warrant application for

15  the dealer's vehicle.   Id. at page 7.   The declaration specifically detailed the

16  dealer's false exculpatory statements.   Id. at page 6.   Officer Gonzalez submitted

17  the warrant application via e-mail at 9:12 p.m. on Thursday, October 22, 2020.

18  _____

19  1 WPD's report redacts the source's name.   The source's identity is known to the defense and
    is contained in Exhibit H, which is filed under seal.   This brief will refer to the person as the
20  "source" or "dealer," as appropriate for clarity and context.

1 Exhibit H, pg 1.  Judge Roy Fore electronically approved the warrant eighteen

2 minutes later, at 9:30 p.m. on October 22, 2020.  Id.

3         All Lies Forgiven:  the Dealer Becomes a "Reliable" Source

4       After failing to lie her way out of trouble, the source claimed that she could

5 provide Officers Gonzalez and Sund with information about a "higher-level drug

6 dealer in Wenatchee[.]"  Exhibit C, pgs 2-3.  WPD declared that the source said

7 she would do so "in consideration on [her] pending charges[.]"  Id., pg 3.

8       WPD thereafter deemed the source to be a "confidential informant" or "CI"

9 against Mr. McVay.  Id., pg 2.  Yet, the warrant application does not include any

10 information indicating that the source had, prior to her arrest on October 22, 2020,

11 provided WPD with *any* information about *any* criminal activity, whether verified

12 or not.  Id., generally.

13       The investigation took a strange twist.  The source claimed that Mr. McVay

14 was her "main supplier" and that Danielle Quintana was her *backup* supplier.  Id.,

15 pg 3.  However, WPD asked the source to make a controlled buy not from Mr.

16 McVay, but instead from Quintana.  Id.  In fact, the warrant application details

17 no effort whatsoever to buy drugs from Mr. McVay.  Id.

18       Officers Sund and Gonzalez hastily arranged the buy from Quintana.  Id.

19 Three male officers - Officer Sund, Officer Gonzalez, and Detective Battis –

20

1 searched the source prior to attempting a buy from Quintana. Id. WPD

2 instructed her "to go straight to the residence and conduct the deal outside where

3 [she] would be visible to surveillance units." Id.

4        The source left for Quintana's house (420 Pearl Street) sometime after 11:00

5 p.m. on October 22, 2020, but repeatedly failed to thereafter follow the officers'

6 instructions. Id. The source had agreed to "go over to the 420 Pearl ST residence

7 and knock on the door." Id. WPD had also instructed the source to "conduct the

8 deal outside where the CI would be visible to surveillance units." Id. Yet, the

9 source "went toward the back of [Quintana's] residence[.]" Id. Although Officer

10 Sund claims she did so only "momentarily[,]" he also concedes that the source

11 "returned to [her] car a *couple of minutes* later."[2] Id., pg 4 (emphasis added). The

12 source thereafter checked in with Detective Battis and told him that Quintana was

13 not home but that she might be at another location, referred to as the "Plaza

14 Superjet." Id. Detective Battis did not re-search the source after the break in

15 visual contact, but instead sent her on her way to the Plaza Superjet. Id.

16        The source eventually found Quintana and gave her a ride back to

17 Quintana's residence. Id. Officer Sund claims that WPD observed Quintana

18

19 ─────────────────
2 The warrant is also unclear as to what the affiant, Officer Gonzalez, personally observed versus
20 what he might have heard through other surveillance units.

1 "hand[] the CI something."  Id.  WPD claims that "the CI grabbed cash and gave

2 it over to Danielle from the front seat of her car."  Id.  WPD claims that Quintana

3 handed the source "something."  Id.

4      The source returned to the police station, where officers searched her person

5 and found a small bag of methamphetamine.  Id.  There is no indication that

6 officers moved against Quintana to make an arrest or to leverage her to investigate

7 Mr. McVay.[3]

8      Indeed, Mr. McVay was never mentioned, referenced, or otherwise

9 discussed in connection with the buy from Quintana.  Id.  Instead, the full extent

10 of the source's allegations against Mr. McVay appear in the following excerpts

11 from Officer Sund's declaration for the first search warrant against Mr. McVay:

12 //

13 //

14 //

15 //

16 //

17 //

18

19 ─────────────────────

3 As the defense's original motion notes, there is no evidence that Quintana was ever charged

20 with distributing methamphetamine.

**AMENDED MOTION TO SUPPRESS - 7**

1    In addition to this controlled buy, the CI stated he/she mainly gets his/her meth from
Gordy McVay. CI stated he/she has known Gordy his/her whole life. Officer Gonzalez

2 has contacted the CI with Gordy in the past and CI corroborated this information. CI
stated he lives on S Western Ave. Officer Gonzalez has been there before. Officer

3 Gonzalez knew the CI was referring to 704 S Western Ave. The CI stated he/she had
been there earlier today where CI purchased about a half ounce of meth he/she split with
another person. The CI stated Gordy was on the backside of the house working on a car

4 when CI arrived. Gordy retrieved a gallon-sized Ziploc bag which was about a quarter of
the way full of meth and weighed out CI's half ounce inside his fifth wheel trailer. CI

5 stated he/she paid $240 and estimated Gordy still had about 4 ounces of meth left. The CI
stated Gordy keeps the methamphetamine in a black fanny pack he keeps on his person or
places the bag inside the fifth wheel trailer. On this occasion, CI stated he grabbed the

6 bag from the trailer when CI arrived.

7    The CI stated Gordy's property contains a camper and a fifth wheel trailer on the
backside of the home. The camper is used by Gordy as storage. It's white in color and

8 located on the south west corner of the property. The fifth wheel trailer is used by Gordy
as a hangout spot and he usually smokes drugs inside. The fifth wheel is tan in color and

9 perpendicular to the house(east / west on the property). CI stated Gordy occasionally
sleeps in the fifth wheel trailer but mostly sleeps inside the house. CI stated there are two

10 other people who live at the address: Gordy's mother Bonnie and his sister Nancy. The
CI also informed me several people come and go from this property at all times of the
day. CI stated Gordy sells drugs out of this location to several people.

11

12 Id., pgs 4 to 5.

13      Bonnie Sullivan, Mr. McVay's mother, in fact owns the real property and

14 residence at 704 S. Western Avenue, Wenatchee, Washington. See Case No.

15 2:21-cr-55-WFN, United States v. McVay, ECF No. 24, pg 10 (link to Chelan

16 County Assessor's records on the property - https://bit.ly/3vzwJil).   WPD did not

17 clarify whether the dealer was referring to the residence or the fifth wheel when

18 she mentioned "this location[.]"   Exhibit C, pg 5.

19      Judge Fore granted the first search warrant against Mr. McVay on October

20

**AMENDED MOTION TO SUPPRESS - 8**

1 23, 2020.   However, WPD did not immediately execute the warrant and would not

2 in fact do so for another seven days.   See Exhibit D, pg 1.   Officers Sund's and

3 Gonzalez's post-arrest reports detail no additional steps to verify or corroborate the

4 dealer's allegations in the 7-day period between Judge Fore granting the warrant

5 and WPD's raid.   Id.

6                           **C.   The Pursuit and Raid**

7        On the day of the raid, October 30, 2020, Officers Sund and Gonzalez were

8 assigned as a "two-officer unit […] in the area of Cherry ST and Lambert ST."

9 Id., pg 3.   This is nearly a half-mile away from Bonnie Sullivan's residence.

10 Prior to executing the warrant, officers confirmed that Mr. McVay had an

11 outstanding warrant for driving with a suspended license.   Id.

12        Separate teams of WPD and affiliated agencies participated in the raid.   One

13 group of officers monitored the South Western Ave. property, and as noted,

14 Officers Sund, Gonzalez, and others were on a mobile patrol.   Id.   Before the raid

15 began, Officers Sund and Gonzalez received a radio alert that an unknown male

16 individual (suspected, but not confirmed, to be Mr. McVay) had left the fifth wheel

17 and mounted a motorcycle.   Id.   The male started driving away from 704 S.

18 Western Ave.   Id.

19        Officers Sund and Gonzalez received updates on the rider's location.

20

1 Officer Gonzalez later represented in his warrant declaration that "a traffic stop

2 take down was conducted on the rider as he approached Lewis ST and S Chelan

3 Ave based on reasonable suspicion he was Gordy and also the fact he committed a

4 dangerous traffic violation."  Id., pg 3.

5       After stopping the motorcycle, officers confirmed Mr. McVay's identity.

6 Id.  Immediately, "Gordy was placed into custody by officers and Officer Sund

7 read him his Miranda rights."  Id.  Officers Gonzalez and/or Sund began

8 questioning Mr. McVay not about the DWLS, but instead about the drug

9 investigation.[4]  Id.

10      During the questioning at the arrest scene, Officer Gonzalez claims he

11 eventually "noticed a black fanny pack mounted on the handlebars."  Id.  Officer

12 Sund had referenced a fanny pack in the first warrant declaration when he swore

13 that "[the dealer] stated Gordy keeps the methamphetamine in a black fanny pack

14 he keeps on his person or places the bag inside the fifth wheel trailer."  Exhibit C,

15 pg 4.  Officer Gonzalez offered a different reference to the fanny pack in his

16 declaration for the second warrant:  "[d]uring our interview with [the dealer],

17 [she] informed me Gordy usually keeps the larger quantity of his drugs in a black

18

---

19

4 Curiously, it was Officer Gonzalez who previously cited Mr. McVay for the DWLS for which
20 Mr. McVay had a bench warrant.

**AMENDED MOTION TO SUPPRESS - 10**

1 fanny pack and keeps it on his person *or very close to him*." <u>Exhibit D</u>, pg 3

2 (emphasis added).

3      Officer Gonzalez told Mr. McVay that he would apply for a warrant to

4 search the pack. <u>Id</u>. at page 4. Another officer "took custody of the motorcycle

5 and took it back to the WPD officer where it was secured." <u>Id</u>. Officers Sund

6 and Gonzalez took Mr. McVay for processing, where "he was booked on his

7 warrant only and pending additional charges based on the findings of the search

8 warrant at his property." <u>Id</u>.

9      Rather than immediately applying for a warrant to search the fanny pack,

10 however, Officer Gonzalez instead arranged for a canine to sniff the motorcycle

11 and fanny pack at the station. <u>Id</u>., pg 4. Officer Gonzalez claims that the canine

12 officer told him that the canine alerted to the fanny pack. <u>Id</u>.

13                   **D. Seizure of the .22-Caliber Pistol**

14      After receiving the results of the dog sniff, Officer Gonzalez still failed to

15 apply for a warrant. <u>Id</u>. Instead, Officer Gonzalez returned to 704 South Western

16 Ave, where he reunited with Officer Sund. <u>Id</u>., pg 5. Other officers had already

17 cleared the home and ordered any occupants out while WPD executed the warrant.

18      The following three excerpts detail the three different versions of how

19 officers claim they found the .22 caliber Ruger in a closet in Bonnie Sullivan's

20

**1** house.    The first excerpt is directly from Officer Gonzalez's declaration in support

**2** of the second search warrant:

**3**

> I contacted Ofc Sund who was inside the primary residence on the property. He was searching a coat closet in the main living room of the residence. Ofc Sund pointed out a box with the name "Gordy M". He opened the box and it contained several pieces of mail addressed to Gordon L McVay. Right next to the box a pistol grip was visible. Ofc Sund removed it to confirm it was real. He cleared the firearm of live ammunition for safety and confirmed it was an actual firearm. He could see the serial number and checked it through Rivercom. The firearm was a Ruger 22 caliber serial number 14-45862. The gun returned stolen from 2017 in a vehicle prowl. Based on the location of the firearm next to Gordy's legal paperwork, I believe probable cause exists for Possession of a stolen firearm. Additionally, Gordy's criminal history deems him ineligible to possess firearms. Specifically, the VUCSA manufacture/deliver (1992) conviction is probable cause for unlawful possession of a firearm in the 1st degree.

**8** <u>Id</u>.    Officer Gonzalez wrote a different version of events in his file report:

**9**

> I contacted Ofc Sund who was inside the primary residence on the property. He was searching a coat closet in the main living room of the residence. Ofc Sund pointed out a box with the name "Gordy M". He opened the box and it contained several pieces of mail addressed to Gordon L McVay. Right above the box a pistol grip was visible wrapped in a plastic bag. Ofc Sund removed it to confirm it was real. He cleared the firearm of live ammunition for safety and confirmed it was an actual firearm. He could see the serial number and checked it through Rivercom. The firearm was a Ruger 22 caliber serial number 14-45862. The gun returned stolen from 2017 in a vehicle prowl. Based on the location of the firearm next to Gordy's legal paperwork, I believe probable cause exists for possession of a stolen firearm. Additionally, Gordy's criminal history deems him ineligible to possess firearms. Specifically, the VUCSA manufacture/deliver (1992) conviction is probable cause for unlawful possession of a firearm in the 1st degree.

**14** <u>Exhibit F</u>, <u>Excerpts from WPD Incident Report</u>, pg 3 (highlight added).    Officer

**15** Sund's file report describes a *third* version of events:

**16**

> On the shelves above Gordon's box of mail were more boxes. In between a white and brown card board box was an object tightly wrapped in a plastic bag. It appeared to be pointing downward at roughly a 45 degree angle. From my training and experience, the ergonomics of the object wrapped in the plastic bag appeared to resemble that of pistol grip. I picked up the object and noticed it was really heavy. I unwrapped if from the plastic bag and determined it was in fact a pistol. There was no magazine in the mag well. For safety purposes, I rendered the pistol safe by pulling the slide back and ensuring there was not a live round in the chamber.

**19**

**20** <u>Id</u>., pg 10.

**AMENDED MOTION TO SUPPRESS - 12**

1      Officers seized the firearm, which became the basis for Mr. McVay's second

2 indictment.   See id.; see also Case No. 2:21-cr-55-WFN, ECF No. 1, Indictment.

3      Officer Gonzalez eventually requested and received a second search warrant

4 during the afternoon or evening of October 30, 2020.   Exhibit B, pg 1.   Officers

5 Sund and Gonzalez thereafter searched the fanny pack and discovered suspected

6 drugs and paraphernalia, which form the basis for the superseding indictment in

7 Case No. 2:21-cr-00055-WFN.

8                **II.   LAW AND ARGUMENT**

9      **A.   The Court Must Suppress the Fruits of the Residence Search Due**

10                **to a Franks Violation**

11      An officer requesting a warrant has a "duty, of course, to do so in good faith,

12 providing all relevant information to the magistrate."   United States v. Hill, 459

13 F.3d 966, 971, fn. 6 (9th Cir. 2006).

14      Pursuant to Franks v. Delaware, 438 U.S. 154 (1978), "a defendant [may]

15 challenge a facially valid affidavit by making a substantial preliminary showing

16 that '(1) the affidavit contains intentionally or recklessly false statements, and (2)

17 the affidavit purged of its falsities would not be sufficient to support a finding of

18 probable cause.'"   United States v. Stanert, 762 F.2d 775, 780 (9th Cir. 1985)

19 (additional citations omitted).   Suppression "remains an appropriate remedy […]

20

1  when a magistrate is misled by information in the affidavit, which the affiant

2  knows, or should know, is false." <u>Hill</u>, 459 F.3d at 971, fn. 6. In reviewing the

3  validity of a search warrant, "a court is limited to the information and

4  circumstances contained within the four corners of the underlying affidavit."

5  <u>Stanert</u>, 762 F.2d at 778.

6      <u>Franks</u> violations may also include "deliberate or reckless *omissions* of facts

7  that tend to mislead." <u>Id</u>. at 780 (emphasis added). With respect to omissions,

8  the rule exists because "[b]y reporting less than the total story, an affiant can

9  manipulate the inferences a magistrate will draw." <u>Id</u>.; <u>see</u> <u>also</u> <u>United States v.</u>

10  <u>Esparza</u>, 546 F.2d 841, 843 (9th Cir. 1976) ("[h]alf-truths and misrepresentations

11  as well as conclusory allegations can reduce the function of a magistrate to that of

12  a rubber stamp upon the law enforcement officer's personal determination of

13  probable cause"); <u>see</u> <u>also</u> <u>United States v. Sheikh</u>, 481 F.Supp.3d 1052, 1055

14  (E.D. Ca. 2020) (sufficient <u>Franks</u> showing where the warrant affidavit "read as a

15  whole[…] paints a picture" of forced labor not supported by the facts). Where the

16  defendant makes such a showing, a hearing must be held at the defendant's request.

17  <u>Franks</u>, 438 U.S. at 155–56; <u>see</u> <u>also</u> <u>Stanert</u>, 762 F.2d at 780.

18      The "effect of the misrepresentations and omissions on the existence of

19  probable cause is considered cumulatively." <u>Id</u>. at 782. Additionally, clear proof

20

1 of deliberate or reckless omission is not required to trigger an evidentiary hearing.

2 Id. at 781.   For example, in Stanert, the Ninth Circuit reversed the trial court's

3 denial of a Franks hearing after it identified multiple "inaccuracies or omissions

4 which were material to the finding of probable cause[:]"

5 • First, the warrant application included an assertion that a neighbor of

6   the defendant called the police regarding manufacturing of cocaine at

7   the defendant's home.   In fact, the caller had merely "'opined that the

8   resident of 2476 Newcastle was probably free basing cocaine.'"   The

9   court concluded that this "misstatement […] impl[ied] that the caller

10  had personally observed drug activity at the residence."

11 • Second, the police failed to disclose to the magistrate that the

12  defendant had not in fact been convicted on an arrest that they

13  referenced in support of the search warrant.

14 • Next, the court concluded that the police misrepresented the

15  defendant's role in an earlier drug lab explosion at the premises.   The

16  police failed to disclose that the appellant had moved into the home

17  *after* the explosion.   The court concluded this was at least a

18  "reckless" omission because the omission implied the appellant was

19  the operator of the drug lab when the earlier explosion occurred.

20

**1** Id. at 780 to 782.

**2**     The court concluded that the defendant made a sufficient showing that the

**3** warrant would have been insufficient to justify probable cause, but for the

**4** omissions and misstatements.   Id. at 782.   Although the police had relied on an

**5** informant who had previously proven reliable, the court nonetheless held that

**6** "[a]lthough the tip in this case came from an informant who had demonstrated

**7** reliability, the information reported represents a bare conclusion which fails to

**8** reveal the informant's basis of knowledge, i.e., whether the informant was relying

**9** on something more substantial than casual rumor[.]"   Id. at 779.

**10**     i.     Misstatements and Omissions in the First Warrant Declaration

**11**      Here, WPD's actions were reckless (at a minimum) in cobbling together a

**12** warrant application that misled the state judge as to the reliability of its "CI" and

**13** the probability of finding evidence in the residence.   These details were essential

**14** to the probable cause determination because WPD bet everything on the dealer's

**15** uncorroborated verbal assertions against Mr. McVay.   See Exhibit C, generally.

**16** **1.    WPD Misrepresented the Reliability of the Dealer's "Tips"**

**17**     First, Officer Sund misleadingly represented that the source "wanted to talk

**18** with law enforcement" about higher level drug dealers.   Yet, Officer Sund wholly

**19** failed to disclose that the source in fact initially *lied* to WPD.   Compare Exhibit

**20**

1 E, pg 6 to Exhibit C, generally. Moreover, the source only claimed to have

2 information about Mr. McVay after WPD called her out on her lie. See id.

3 Officer Sund's declaration was therefore grossly misleading in that it painted the

4 picture that the source voluntarily disclosed information when the truth was that

5 her self-serving disclosure of "information on a higher-level drug dealer" came out

6 only after she got caught in a self-serving lie. See Stanert, 762 F.2d at 780.

7 The failure to disclose the source's untruthfulness in the McVay warrant

8 application was not a mere oversight – WPD knew the importance of the source's

9 false statements. After all, the same WPD officers – Gonzalez and Sund – had

10 used the source's lies to support a search warrant of her own vehicle *the previous*

11 *day*. See Exhibit E, pg 6. Yet, not even twenty-four hours later, Officer Sund

12 authored his declaration against Mr. McVay and only touted the source's

13 trustworthiness, vouching that she "made statements […] against [her] penal

14 interests." See Exhibit C, pg 3. It is impossible to accept that WPD forgot about

15 source's lies when writing the warrant application against Mr. McVay.

16 WPD further bolstered the source by labeling her as a "CI." See id. When

17 "read as a whole," this presentation misleadingly suggested that WPD's

18 information came from an existing and reliable informant. See Sheikh, 481

19 F.Supp.3d at 1055. However, upon information and belief, the dealer was not a

20

1 registered informant – she only provided information after and due to her own

2 arrest for drug distribution.[5]   Moreover, the source lied from the get-go.   As such,

3 WPD presented their source in a way that tended to "manipulate the inferences a

4 magistrate [would] draw" about her reliability.   See Stanert, 762 F.2d at 780.

5       These are fatal Franks violations because WPD presented only the favorable

6 aspects of their "source" and deprived the warrant judge of critical objective

7 information.   The officers undermined Judge Fore's constitutional role to

8 *independently* assess the source's credibility.   See United States v. Esparza, 546

9 F.2d 841, 844 (9th Cir. 1976) (officers' "misrepresentations made it impossible for

10 the neutral magistrate to exercise his independent judgment").   The omission of

11 the source's lies took on paramount importance in Mr. McVay's investigation

12 because WPD in effect funneled the judge to blindly trust uncorroborated and

13 untested representations against Mr. McVay.   See Exhibit C, pg 4.

14       This Franks violation is a standalone reason to strike the first warrant.

15 However, the problems with the first warrant go much deeper.

16 **2.   WPD Misled the Judge as to Mr. McVay's Connection to the Residence**

17       Whether characterized as a misstatement, omission, or a "half truth," WPD

18

19 ───────────────

5 As this court has seen, federal investigative agencies use precise terms such as "cooperating
20 defendant" to avoid this kind of transparency issue in warrants.

1 recklessly misrepresented the facts regarding the living situation at 704 South

2 Western Ave. WPD's declaration had the effect of "manipulat[ing] the inferences

3 a magistrate will draw" about whether there was a basis to conclude that Mr.

4 McVay was dealing drugs out of the residence. See <u>Stanert</u>, 762 F.2d at 780.

5      It is important to break down Officer Sund's declaration into its component

6 parts. In so doing, the vagueness and ambiguities of the CI's statements become

7 apparent:

8     &bull; The "CI stated [McVay] lives on S. Western Ave." *The CI never gives*

9       *an address. Officer Sund merely parrots that Officer <u>Gonzalez</u> "knew*

10       *the CI was referring to 704 South Western Ave[.]"*

11     &bull; "[T]here are two other people who live at the address: Gordy's mother

12       Bonnie and his sister." *This statement: (1) assumes that there is only*

13       *one living space on the property, even though WPD knows that is not the*

14       *case; and (2) is written with the implication that Mr. McVay is the*

15       *primary resident of the house, whereas WPD knew or should have known*

16       *that Bonnie Sullivan in fact owned the house.*

17     &bull; "The CI also informed me several people come and go from this property

18       at all times of this day." *"This property" could mean the residence or*

19       *the fifth wheel, each of which is a standalone living space.*

20

- "CI" stated Gordy sells drugs out of this location[.]" *This statement is similarly ambiguous because the source never stated (and WPD never clarified) whether "this location" means the fifth wheel or the house.*

See Exhibit C, pgs 4 to 5.

In other words, each of WPD's premises was faulty. When "read as a whole," these misrepresentations and omissions overstated and mischaracterized Mr. McVay's connection to the residence. See Sheikh, 481 F.Supp.3d at 1055. This was a second critical Franks violation because the source had not given WPD enough to conclude that Mr. McVay was dealing drugs out of the house – she merely stated that Mr. McVay "mostly sleeps in the house." See Exhibit C, pg 5. This information alone could not support a warrant because, of course, Mr. McVay cannot deal drugs while he is asleep. As such, WPD could only get a warrant if they could strengthen Mr. McVay's presence in and dominion over the house. The warrant was therefore fundamentally misleading.

ii.  Purged of the misstatements and omissions, the first warrant declaration does not establish probable cause.

As stated in Mr. McVay's initial motion to suppress, the Ninth Circuit has set out four general factors to consider when evaluating whether an informant's tip provides probable cause:

1      (1) Whether the tip was anonymous;

2      (2) Whether the informant had "a proven track record of reliability;"

3      (3) Whether the informant revealed her basis of knowledge; and

4      (4) Whether the informant provided detailed, predictive information that was

5 "later corroborated by police observation."

6 United States v. Rowland, 464 F.3d 899, 907-08 (9th Cir. 2006); see also United

7 States v. Martinez-Garcia, 397 F.3d 1205, 1216 (9th Cir. 2005) ("we examine

8 whether the informant's information was bolstered by independent police

9 investigation of the tip or corroboration by other confidential informants"); see also

10 United States v. Mendonsa, 989 F.2d 366, 369 (9th Cir. 1993) ("mere confirmation

11 of innocent static details is insufficient to support an anonymous tip").

12      The need for corroboration cannot be overstated, particularly where a source

13 has a checkered history.   For example, in United States v. Elliott, which involved

14 a Franks challenge, the Ninth Circuit recognized that "when an informant's

15 criminal history includes crimes of dishonesty, additional evidence must be

16 included in the affidavit 'to bolster the informant's credibility or the reliability of

17 the tip.'"   322 F.3d 710, 716 (9th Cir. 2003).   The court drew a red line:

18 "[o]therwise, 'an informant's criminal past involving dishonesty is *fatal* to the

19 reliability of the informant's information, and his/her testimony *cannot* support

20

1 probable cause.'" Id. (emphasis added). The court concluded that the warrant

2 against Elliot passed muster only because the informant had provided *six* "reliable

3 drug-related tips in the preceding three months[.]" Id.

4       Here, the source's tip fails to meet any of the Rowland indicia of reliability.

5 First and foremost, the source's character for untruthfulness was an overwhelming

6 factor against her reliability. See id. The source came to WPD with a history of

7 dishonesty – convictions for identity theft, possession of stolen property, and

8 obstructing law enforcement.[6] See Exhibit C, pg 3. Proving that a tiger cannot

9 change its stripes, she then directly and squarely lied to law enforcement to try to

10 get out of trouble. See Exhibit E, pg 6.

11       The source's "criminal past involving dishonesty" was thus "fatal" in the

12 absence of corroboration. See Elliot, 322 F.3d at 716. Yet, WPD provided no

13 "additional evidence […] to bolster the informant's credibility or the reliability of

14 the tip.'" See id. WPD took no additional investigative steps after securing a

15 warrant. See Exhibit D, generally. It was not as though there was a rush –

16 officers sat on the warrant for a week. See id. Indeed, the fact that Officers

17 Gonzalez and Sund never made *any attempt* to buy from Mr. McVay strongly

18 suggests that the officers harbored significant doubt about their source's reliability.

19

---

20 6 The source had other convictions relating to drugs and driving offenses.

1      Similarly, the source had no "track record" to overcome her demonstrated

2 character for dishonesty.  See Rowland, 464 F.3d at 908.  First and foremost, if

3 WPD had felt that the source could be trusted on her word, they would not have

4 attempted the buy from Quintana.[7]  See Exhibit C, pgs 2-4.  Moreover, even

5 when they attempted the buy from Quintana, the source failed to follow

6 instructions and WPD lost tactical control of the operation, undermining any claim

7 of it being a "controlled buy."  See id., pg 4.  Thus, unlike Elliot (or even the CI

8 to whom the source sold meth), her claims had no indicia of reliability to overcome

9 the general rule that testimony from an informant with a criminal history of

10 dishonesty "cannot support probable cause.'"  See 322 F.3d at 716.

11      As to the remaining Rowland factors, WPD failed to elicit the source's basis

12 of knowledge regarding her allegations against Mr. McVay.  See 464 F.3d at 908.

13 For example, the source stated that Mr. McVay "mostly sleeps inside the house."

14 See Exhibit C, pg 5.  Similarly, the source stated that "Gordy sells drugs out of

15 this location to several people."  See id.  The source never disclosed – and WPD

16 apparently never asked – the simple question of how the source knew this

17 information.  See id.  The source's claims are therefore no different from those

18

---

19 7 As noted in the defense's original motion to suppress, no charges were ever filed against
Quintana.  Thus, WPD's mere characterization of the buy as "controlled" should be given no
20 deference.

**1** rejected in <u>Stanert</u>, i.e., "a bare conclusion which fails to reveal the informant's

**2** basis of knowledge, i.e., whether the informant was relying on something more

**3** substantial than casual rumor." <u>See</u> 762 F.2d at 779.

**4**     Further, the source's claim that she purchased drugs from Mr. McVay during

**5** the earlier portion of the day of her arrest falls short of providing probable cause

**6** to search the house. <u>See</u> <u>Exhibit C</u>, pg 4. According to the source's own

**7** description, no portion of the buy occurred in the house. <u>See</u> <u>id</u>. Mr. McVay was

**8** outside when the source claims she approached him. <u>See</u> <u>id</u>. The source claims

**9** Mr. McVay retrieved drugs from the *fifth wheel, not the residence.* <u>See</u> <u>id</u>.

**10** Nothing about the source's report of an "earlier" buy from Mr. McVay provided

**11** reason to believe there would be drugs in the house. <u>See</u> <u>Greenstreet v. City of</u>

**12** <u>San Bernardino</u>, 41 F.3d 1306, 1309 (9th Cir. 1994) ("[a] search warrant

**13** designating more than one person or place to be searched must contain sufficient

**14** probable cause to justify its issuance as to each person or place named therein").

**15**     The remaining details in the declaration are simply too vague or lacking in

**16** foundation to support probable cause or to serve as corroboration of the source's

**17** claims. For example, Officer Sund vaguely claimed that Officer *Gonzalez* had

**18** "personally received information from several sources stating Gordy is selling

**19** drugs out of his mother's residence." <u>See</u> <u>Exhibit C</u>, pg 5. Yet, WPD disclosed

**20**

1  absolutely nothing about these so-called "sources[']" bases for knowledge or their

2  reliability.   See Rowland, 464 F.3d at 907-08.   Similarly, Officer Sund claims

3  that Officer *Gonzalez* has "contacted Gordy on several occasions in company of

4  known drug users as recently as earlier this week."   See Exhibit C, pg 5.

5  However, a review cannot infer illegal activity from this statement, or even discern

6  what is meant by "contacted."   For example, a judge cannot tell whether Officer

7  Sund is saying that Officer Gonzalez saw Mr. McVay deal drugs, or if Officer

8  Gonzalez merely observed Mr. McVay associating with people who use drugs –

9  the latter of which is not illegal.   See Ybarra v. Illinois, 444 U.S. 85, 91 (1979) (a

10  "person's mere propinquity to others independently suspected of criminal activity

11  does not, without more, give rise to probable cause to search that person").

12       Taking all factors into consideration, the warrant declaration did not provide

13  probable cause independent of the Franks issues.   The source's character for

14  untruthfulness, the vagueness of WPD's other information, and the lack of

15  "independent police investigation of the tip" all undermine any claim that the

16  warrant could have issued in the absence of WPD's omissions and

17  mischaracterizations about Mr. McVay.[8]   See Martinez-Garcia, 397 F.3d at 1216.

18

---

19  8 As noted in Mr. McVay's initial motion, the state judge took, at most, 18 minutes to review
    the warrant application.   Proper time and attention should have led the judge to recognize the
20  inconsistencies and omissions between the source and McVay warrants.   See Exhibit C, pg 3.

**AMENDED MOTION TO SUPPRESS - 25**

**1** The appropriate remedy is to suppress the fruits of the first warrant.  See <u>Stanert</u>,

**2** 762 F.2d at 780.

**3**    **B.   WPD Exceeded the Warrant in Searching and Seizing the Ruger**

**4**        Separate and apart from the <u>Franks</u> issues, WPD exceeded the reasonable

**5** boundaries of the first warrant.  See <u>U.S. v. Becker</u>, 929 F.2d 442, 446 (9th Cir.

**6** 1991) ("a warranted search is unreasonable if it exceeds in scope or intensity the

**7** terms of the warrant"); <u>see</u> <u>also</u> <u>Abel v. United States</u>, 362 U.S. 217, 234 (1960)

**8** ("not every item may be seized which is properly inspectable by the Government

**9** in the course of a legal search").

**10**        Officer Sund had no objective basis to believe that the bag in which the

**11** Ruger was wrapped would contain evidence of drug distribution.   Indeed, Officer

**12** Sund disclaimed thinking that it was a bag of drugs.   Officer Sund's report states,

**13** "[f]rom my training and experience, the ergonomics of the object wrapped in the

**14** plastic bag appeared to resemble that of a pistol grip."   See <u>Exhibit F</u>, pg 10.   As

**15** such, the warrant did not extend to the contents of the bag in which Officer Sund

**16** found the Ruger.   See <u>Exhibit A</u>, pg 1.

**17**    **C.   WPD had No Separate Justification to Search and Seize the Gun**

**18**        To support a warrantless seizure of property under the plain view doctrine,

**19** police "must be lawfully searching the area where the evidence is found and the

**20**

1 incriminatory nature of the evidence must be immediately apparent." <u>United</u>

2 <u>States v. Lemus</u>, 582 F.3d 958, 964 (9th Cir. 2009); <u>see</u> <u>also</u> <u>United States v.</u>

3 <u>Holmes</u>, 36 F.Supp.3d 970, 978 (D. Mont. 2014) (rejecting plain view search and

4 seizure of suppressed firearm from convicted felon where there was "no indication

5 that the modified Ruger was per se illegal"); <u>see</u> <u>also</u> <u>United States v. Koepnick</u>,

6 2009 WL 2591683, *6 (D. Idaho 2009) (suppressing sawed off shotgun because

7 officer lacked probable cause to further examine the gun where it was partially

8 concealed).

9       Officers may not move or manipulate an item to justify a plain view search.

10 <u>See</u> <u>Arizona v. Hicks</u>, 480 U.S. 321, 325-28 (1987) (rejecting plain view as basis

11 for officer's search where the officer moved the stereo equipment to identify serial

12 numbers: "a truly cursory inspection – one that involves merely looking at what

13 is already exposed to view, without disturbing it – is not a 'search[.]'" <u>Id.</u> at 328.

14       The doctrine of plain *touch* similarly requires that an item's incriminating

15 character must be "immediately apparent" before officers may seize it without a

16 warrant. <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 379 (1993) (rejecting plain touch

17 search because the officer "determined that the item was contraband only after

18 conducting a further search").

19       Critically, there are three materially different versions of how WPD came to

20

1 seize the firearm. Under all versions, WPD conducted a "search" of the gun. <u>See</u>

2 <u>Hicks</u>, 480 U.S. at 328 ("the 'distinction between 'looking' at a suspicious object

3 in plain view and 'moving' it even a few inches' is much more than trivial for

4 purposes of the Fourth Amendment"). All versions of events confirm that WPD

5 took physical custody of the gun, thereafter manipulating and examining it. <u>See</u>

6 <u>Koepnick</u>, 2009 WL 2591683 at *6. Under Officer Sund's version of events, the

7 search was particularly intrusive because he had to unwrap the firearm. <u>See</u>

8 <u>Exhibit F</u>, pg 10. As an initial matter, then, WPD's actions to expose the Ruger's

9 serial number triggered the Fourth Amendment's requirement for a warrant or

10 justification for a warrantless seizure. <u>See</u> <u>Hicks</u>, 480 U.S. at 328 ("[a] search is

11 a search, even if it happens to disclose nothing but the bottom of a turntable").

12       Plain view did not support the officers' warrantless search of the Ruger.

13 There is nothing inherently illegal about possession of a firearm. <u>See</u> <u>Koepnick</u>,

14 2009 WL 2591683 at *6. True to point, WPD found several other firearms while

15 searching Mrs. Sullivan's home. <u>See</u> <u>Exhibit F</u>, pg 16 (Officer Miller states that

16 Bonnie Sullivan told officers she had four firearms in the house). Moreover, the

17 second warrant declaration recites no details about the firearm's appearance or

18 characteristics that would immediately reveal that it was stolen. To the contrary,

19 WPD had to unwrap the gun and run a serial number inquiry to determine that it

20

1 was stolen.   See Exhibit F, pg 10.   Thus, the incriminating nature of the firearm

2 was not "immediately apparent."   See Lemus, 582 F.3d at 964.

3       For several reasons, Mr. McVay's status as a felon did not justify searching

4 the Ruger.   First, officers did not seize the weapon on this basis.   Officer Sund

5 seized the weapon to make sure it was "safe."   See Exhibit F, pg 10.   More

6 importantly, officers did not have a basis to "immediately" attribute the weapon to

7 Mr. McVay at that point in the investigation.   Before Officer Sund found the

8 pistol, Bonnie Sullivan had told Officer Miller that she could not account for two

9 of her four weapons – those two firearms were pistols.   See Exhibit F, pg 16.

10 Given that two of Bonnie's firearms were yet to be discovered, Officer Sund could

11 not jump to the conclusion that the pistol was Mr. McVay's.[9]

12       Indeed, WPD had no information suggesting that weapons were a factor in

13 the investigation of Mr. McVay.   See Exhibits C and D, generally.   Thus, WPD

14 officers lacked a basis to search or seize the Ruger, and it must be suppressed as

15 the fruit of an illegal search.

16

17

18 _____

19 9 The fact that officers found a box with Mr. McVay's name on it in a closet in his mother's residence is a wholly neutral fact that suggests nothing about the scope of Mr. McVay's dominion and control.   Contrast Lemus, 582 F.3d at 964 (upholding plain view seizure of firearm where the officers observed a firearm in the defendant's known apartment).

20

1  **E.  WPD Illegally Extended the Traffic Stop After Determining Mr.**

2  **McVay's Identity**

3      Police may not extend a traffic stop beyond its "mission," i.e., "to address

4  the traffic violation that warranted the stop."  <u>Rodriguez v. United States</u>, 575 U.S.

5  348, 354 (2015).  In <u>Rodriguez</u>, the Supreme Court concluded that this rule meant

6  that officers could not prolong a traffic stop to allow a drug dog to sniff the vehicle.

7  <u>Id</u>.  The Court rejected the lower court's rationale that the dog sniff merely

8  extended the traffic stop by "seven to eight minutes."  <u>Id</u>. at 354.  The Court

9  confirmed that the Fourth Amendment can only "tolerate[] certain unrelated

10  investigations that [do] not lengthen the roadside detention."  <u>Id</u>.

11      <u>Rodriguez</u> is dispositive in Mr. McVay's case.  Mr. McVay had an active

12  warrant for DWLS.  <u>Exhibit D</u>, pg 1.  WPD's only "mission" could be to confirm

13  Mr. McVay's identity.  <u>See id</u>.  Once WPD confirmed Mr. McVay's identity, that

14  was the end of the story – any further investigation or inquiries were unnecessary

15  and improper.  <u>Contrast id</u>. at 355 (reciting incidents of traffic stops: "such

16  inquiries involve checking the driver's license, determining whether there are

17  outstanding warrants against the driver, and inspecting the automobile's

18  registration and proof of insurance").  Once WPD began questioning Mr. McVay

19  about matters relating to their drug investigation, such as the fanny pack, they

20

1   "measurably extend[ed]" the duration of the stop beyond its purpose. <u>See</u> <u>id</u>. at

2   357. Any evidence resulting from the prolongation of the traffic stop is therefore

3   inadmissible. <u>See id</u>. ("a traffic stop 'prolonged beyond' that point is "unlawful").

4                <u>WPD Lacked Probable Cause to Seize the Motorcycle</u>

5       WPD seized Mr. McVay's motorcycle on a mere hunch. <u>See</u> <u>United States</u>

6   <u>v. Johnson</u>, 256 F.3d 895, 905 (9th Cir. 2001) ("[t]he Supreme Court […] has made

7   it clear that 'hunches' are insufficient to establish reasonable suspicion, let

8   alone probable cause"). More specifically, WPD lacked probable cause to believe

9   that the motorcycle or fanny pack were evidence of a crime or contained evidence.

10       Standing alone, the motorcycle and fanny pack are "innocent static details"

11   that are not probative on criminal activity. <u>See</u> <u>Mendonsa</u>, 989 F.2d at 369 (9th

12   Cir. 1993). The only possible link between the fanny pack and possible drug

13   activity came from the ever-problematic dealer-turned-source. <u>See</u> <u>Exhibit C</u>, pg

14   5. As with other aspects of the source's "tips," the information about the fanny

15   pack was conclusory and unreliable. <u>See</u> <u>Rowland</u>, 464 F.3d at 907-08.

16       The source provided no factual basis for the arresting officers to believe that

17   the fanny pack would have evidence in it. <u>See</u> <u>Exhibit C</u>, pg 4. The fanny pack

18   played no role in the source's story about buying drugs from Mr. McVay on the

19   day of her arrest. <u>See</u> <u>id</u>. Indeed, the source told WPD that Mr. McVay

20

1 "retrieved his drugs from a *gallon-size Ziploc bag* which was a quarter of the way

2 full of meth." See id. (emphasis added). In other words, even if we put aside the

3 source's unproven track record and her *self-serving lies* to WPD, the source still

4 did not tell a story that linked the fanny pack to any illegal activity. See

5 Mendonsa, 989 F.2d at 369. WPD failed, again, to thoroughly vet their "CI."

6 There is no independent evidence that the fanny pack was evidence of crime.

7 See Exhibit C, generally. WPD did not supply any evidence about previous buys

8 where Mr. McVay pulled drugs from the fanny pack. See id., pgs 4-5. WPD

9 claims to have had other "sources" or information from "drug users," yet there is

10 nothing suggesting they mentioned a fanny pack. See id. WPD provided no

11 photos or surveillance of Mr. McVay doing anything with drugs or the fanny pack,

12 even though their raid on October 30, 2020, suggests they had a vantage point to

13 observe such behavior -- if the allegations were true. See Exhibit D, pg 3

14 ("CRDTF were setup near the residence and observed a male exit the Fifth Wheel

15 trailer in the back lot (west side)"). Lastly, the motorcycle seizure came before

16 WPD even began raiding the fifth wheel or the residence – nothing new had

17 developed since the warrant issued *a week earlier*. See id., pg 3.

18 The final giveaway for the lack of probable cause is the fact Officer

19 Gonzalez immediately requested a canine sniff after impounding the motorcycle

20

**AMENDED MOTION TO SUPPRESS - 32**

1 but *before applying for a warrant.* See Exhibit D, pgs 3-4. If Officer Gonzalez

2 believed he had more than a hunch, there should have been no need for a drug dog

3 sniff. In reality, WPD's actions demonstrated a "seize first, justify later" approach

4 that must be rejected under any application of the Fourth Amendment. See e.g.

5 United States v. Barajas, 517 F.Supp.3d 1008, 1025 (N.D.Ca. 2021) ("If officers

6 were allowed to seize items not reasonably identified as contraband at the time of

7 seizure, this bootstrapping approach would vitiate the probable cause standard for

8 seizures of property[…] [t]he proper inquiry must focus on whether probable cause

9 existed at the time of seizure, not at some time thereafter"). As such, officers

10 lacked probable cause to seize the motorcycle or the fanny pack. The resulting

11 evidence must be suppressed for a lack of probable cause.[10]

12     **F. Additional Franks Violations Undermine the Second Warrant**

13     The second warrant does not cure the unconstitutional warrantless seizure of

14 the motorcycle because the warrant declaration included material misstatements.

15 These omissions undermined the judge's probable cause determination,

16 particularly in light of the cumulative nature of Franks violations. See Stanert,

17 762 F.2d at 782.

18

---

19 10 The community caretaking exception is inapplicable because WPD seized the motorcycle
with a clear investigatory purpose. See South Dakota v. Opperman, 428 U.S. 364, 376 (1976);
20 see also Exhibit D, pg 4.

1     Officer Gonzalez's warrant declaration is inconsistent with Officer Sund's

2 warrant declaration regarding the source's representations as to the fanny pack.

3 The first warrant states that the source told officers that Mr. McVay "keeps the

4 methamphetamine in a black fanny pack he keeps on his person or places the bag

5 inside the *fifth wheel trailer*[.]" See Exhibit C, pg 4 (emphasis added). Officer

6 Gonzalez's declaration omits the source reference to the fifth wheel, and instead

7 states that that the source told WPD that Mr. McVay kept the fanny pack "close to

8 his person." See Exhibit D, pg 3.

9     This language, whether characterized as an omission or a misstatement,

10 "tended to mislead" because it created a more favorable connection for law

11 enforcement to assume that otherwise innocent possession of a fanny pack was

12 indicative of drug distribution activity. See Stanert, 762 F.2d at 780. WPD gave

13 the judge only half of the story when it came to the potential locations of Mr.

14 McVay's alleged drug supply, in effect funneling the judge into the conclusion that

15 the fanny pack *must* contain drugs when in fact the source identified other possible

16 locations (i.e., the fifth wheel, which had yet to be searched when officers seized

17 the motorcycle). See Exhibit D, pgs 3 and 5. Moreover, the misrepresentations

18 created an unjustified appearance of corroboration because it is not even clear that

19 the source said what Officer Gonzalez wrote in his declaration.

20

1     Next, the second warrant declaration misstates how the officers found the

2 gun.   As discussed earlier, there are three versions of how the officers found the

3 Ruger.   The version presented to the judge was a hearsay report that was different

4 from that of the officer who in fact found the weapon.   <u>Compare</u> <u>Exhibit D</u> to

5 <u>Exhibit F</u>, pg 10.   This misstatement reflects why <u>Franks</u> violations have a

6 cumulative effect –multiple issues go to the fundamental integrity and

7 trustworthiness of a warrant application presented to a judge.   <u>See</u> <u>Stanert</u>, 762

8 F.2d at 782.   This case therefore demonstrates why the law recognizes that there

9 is a straw that breaks the camel's back.   <u>See</u> <u>id</u>.   Accordingly, the second warrant

10 was invalid.   <u>See</u> <u>id</u>.

11     **III.   Motion for *in Camera* Review of WPD's Source Materials**

12     The court should order *in camera* review of any source dossier or withheld

13 documents relating to the source.   <u>See</u> <u>Stanert</u>, 762 F.2d at 783.   The source's

14 statements about Mr. McVay do not appear in the officers' report of their

15 interrogation.   <u>Exhibit G</u>, <u>Excerpts of WPD Case No. 20W14901</u>, pgs 1-8.

16 Further, WPD's file indicates that there is at least one recorded statement in

17 connection with the source's arrest.   <u>Id</u>., pg 9.   It is unclear who gave the

18 statement (i.e., the source or the undisclosed CI to whom she initially sold meth).

19 In camera review is necessary and appropriate to determine whether WPD

20

1 committed additional <u>Franks</u> violations.   <u>See</u> <u>Stanert</u>, 762 F.2d at 783.

2 **CONCLUSION**

3  For the above reasons, the Court should suppress the fruits of WPD's

4 searches.   Alternatively, Mr. McVay requests a <u>Franks</u> hearing to further explore

5 WPD's misstatements, omissions, and misrepresentations made in obtaining the

6 warrants at issue.   Lastly, the Court should conduct an in camera review of WPD's

7 source file to determine whether WPD officers made any additional

8 misrepresentations, omissions, or misstatements.

9

 Respectfully Submitted this 5th day of January, 2022.

10

      LAW OFFICE OF ROGER J. PEVEN

11

       */s/ Roger J. Peven*

12       ROGER J. PEVEN
      Attorney for Defendant

13

      BOHRNSEN STOCKER SMITH PLLC

14

       */s/ Justin P. Lonergan*

15       JUSTIN P. LONERGAN
      Attorney for Defendant

16

17

18

19

20

**AMENDED MOTION TO SUPPRESS - 36**

1     **<u>CERTIFICATE OF SERVICE</u>**

2          I HEREBY CERTIFY that on the 5th day of January, 2022, the foregoing
3     document was electronically filed with the Clerk of the Court using the CM/ECF
      system which sent a Notice of Electronic Filing to the following person(s):

4     George J.C. Jacobs III, Assistant United States Attorney

5

6                                          */s/ Justin P. Lonergan*
7                                          JUSTIN P. LONERGAN

8

9

10

11

12

13

14

15

16

17

18

19

20